IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REINALDO KURI                   :          CIVIL ACTION
                                :
        V.                      :
                                :
MERIDIAN BANK et al.            :          NO. 21-4694

MEMORANDUM

Bartle, J.                                    January 19, 2023

        Plaintiff Reinaldo Kuri has sued defendants Meridian
Bank and Meridian Bank Corporation.  Kuri claims that defendants
discriminated against him in violation of the Americans with
Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and the
Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 et
seq., when they terminated him from his sales representative
position at the bank.[1]  Defendants counter that they terminated
Kuri for repeatedly violating the bank's dress code.  Before the
court is the motion of defendants for summary judgment under
Rule 56 of the Federal Rules of Civil Procedure.

                                I

        Under Rule 56 of the Federal Rules of Civil Procedure,
summary judgment is appropriate "if the movant shows that there
is no genuine dispute as to any material fact and the movant is

_____

1.    Kuri initially also asserted claims of gender
discrimination and retaliation under Title VII of the Civil
Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., but the parties
have stipulated to dismiss those claims.

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A factual dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A factual dispute is material if it might affect the outcome of the suit under governing law.  Id. at 248.

The court views the facts and draws all inferences in favor of Kuri, the nonmoving party.  See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).  "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]."  See Anderson, 477 U.S. at 252. "The plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."  Id. at 257.

II

The following facts are undisputed unless otherwise noted.  Kuri began working as a sales representative with Meridian Bank in September 2019.  At all relevant times, he has suffered from a chronic condition involving necrosis in his hips.  He has undergone medical procedures such as hip surgery and nerve ablations for this condition.

In February 2020 Kuri advised his supervisor, Aliese Rosado, that he needed to undergo hip surgery. He took medical leave in March 2020 for this procedure and returned to work that April.

Later in 2020, Rosado began corresponding about Kuri's leave use with Tracy Panati, the bank's Senior Vice President of Human Resources. Panati is responsible for reviewing and approving all bank employees' requests for leave. Rosado and Panati had conversations in which they expressed concern at the amount of leave Kuri was taking. In addition, Rosado emailed Panati on September 28, 2020 with a list of dates on which Kuri had missed a shift or left work early despite having no available paid time off or vacation time. In the email, Rosado included Kuri's asserted reason for missing work on that particular day. Sometimes it was due to a "family emergency." Rosado noted that Kuri was absent on other dates "when he came back from disability" or when he had a doctor's note. Panati suggested in response that Rosado "have a conversation with him about his time" and "encourage him to work as much as he can the day of [his] doctor's appt."

On November 24, 2020, Kuri emailed Rosado to request another medical leave so that he could undergo surgery on December 24. Rosado requested that Kuri reschedule his surgery to an earlier date that month because the bank branch to which

Kuri was scheduled to report would be short-staffed that day.
Rosado also forwarded Kuri's request to Panati, who in turn
suggested that Rosado ask Kuri to "push [his procedure] to the
new year when he has time available."

Rosado admits she referred to Kuri as "old man."
According to Kuri, Rosado made these comments while also
discussing his hip condition and his prior hip replacement
procedures.  Rosado testifies that she made these comments when
she would "joke around with" Kuri and would do so after Kuri
made self-deprecating comments about his ailments.  Kuri
testifies that he aired complaints about discrimination to
Rosado and Panati at least twice about perceived discrimination
as to both his gender and disability status, but it is unclear
whether he complained specifically about Rosado's "old man"
comments.

On June 4, 2021, Kuri emailed Rosado to request FMLA
paperwork ahead of a planned doctor's appointment.  She
forwarded the request to Panati.  Panati emailed Kuri with the
required forms and informed him that he was required to complete
and return them to her by June 25.  Kuri responded by
questioning why he had to return the forms by that date.  Panati
called and explained that the June 25 deadline was required by
the company's policies and the FMLA.  Kuri replied that because
of the challenges of visiting his doctor's office during the

COVID-19 pandemic, he would not be able to visit his doctor's office to get the paperwork filled out until June 29.  Panati requested that he coordinate the paperwork with his doctor virtually.  Kuri believed that Panati was giving him "a hard time."  He complained to Panati that he felt other employees had been given more flexibility to work remotely and accused her of discriminating against him on the basis of his gender, sexual orientation, and disability status.  Panati acknowledged that Kuri complained about discrimination as well as the way his FMLA request was being treated.  However, she said his complaints focused primarily on why he was not hired through an internal process for a human resources position.

Nonetheless, Kuri returned the paperwork on June 29, and Panati approved his request.  Kuri took FMLA leave on July 1 and 6 to receive neuro-injections and ablations.  Two weeks later, on July 20, 2021, Panati and Rosado met with Kuri and informed him that he was being terminated.

Panati and Rosado informed Kuri that he was being terminated for his repeated failure to follow the bank's "professional image" policy.  The bank's employee handbook states as follows:

> Acceptable personal appearance is an ongoing
> requirement of employment with Meridian Bank
> . . . . Employees who have regular contact
> with the public are expected to dress in a
> manner that is normally acceptable in the

-5-

> business community. Employees should not
> wear suggestive attire, jeans, athletic
> clothing, shorts, sandals, T-shirts,
> baseball hats, and similar items of casual
> attire.

Defendants cite four instances in which Kuri violated this policy.  Sometime prior to October 2020, Rosado observed Kuri walking around a bank branch without shoes.  Rosado was notified by a member of the bank's senior management that on another day in October or November 2020, Kuri was again observed not wearing shoes in the bank.  Rosado relayed this complaint to Kuri and admonished him that his conduct violated the above-mentioned policy.  In response to this email, Kuri informed Rosado that he believed his not wearing shoes was not a concern because he did so only outside of the presence of customers.  He also stated that "several retail associates" do the same.  In response, Rosado emailed all bank employees to remind them of their professional dress obligation.  Kuri was not disciplined for either incident.

On June 24, 2021, Kuri appeared in the bank lobby during banking hours and attempted to assist a customer while wearing an undershirt.  Kuri's colleague, Beth Bauer, chided him for wearing his undershirt and told him to go back to the bank vault so that she could assist the customer instead.  Bauer relayed the details of this incident to Rosado.  Surveillance video and several photographs taken of Kuri on June 24 reflect

-6-

that he was wearing a T-shirt while walking around the public area of the bank branch that day.  A surveillance video screenshot also shows Kuri with his T-shirt pulled above his arm and his bare flank exposed during business hours while he was sitting at a desk that was visible to customers.

Finally, on July 20, 2021, the date of Kuri's termination, he again wore a T-shirt in the bank lobby when the bank was open for business.  Several of his colleagues noticed and informed Rosado.  Two of his colleagues photographed him wearing the T-shirt, and one sent a photo to Rosado at Rosado's request. A third employee emailed Rosado to complain about Kuri's attire.  Rosado consulted with Panati, and they agreed to recommend that Kuri be terminated.  Later that morning, Panati sent one of the photos of Kuri to Christopher Annas, the CEO of Meridian Bank.  She included in the text, "Can you call me as soon as possible regarding Reinaldo [Kuri].  This is how he showed up today.  Would like to go up and term[inate] him now but wanted to talk with you as we know that there may be some issues that stem from this."  Annas simply responded, "Fire him."

Kuri is the only bank employee to have ever been disciplined for violating defendants' professional image policy. Nonetheless, Kuri cites instances in which his colleagues allegedly violated the dress code and were not disciplined.

First, Barbara Jackson sometimes wore jeans to work and did so on days other than "casual" Fridays, a day when the dress code was relaxed to permit employees to wear jeans.  Rosado had told her that in light of the pandemic, employees were permitted to wear jeans every day.

Second, Kuri witnessed Beth Bauer walking around the bank branch in socks, without shoes.  He says this happened on "several" occasions and at times in which customers were present in the bank branch.  Bauer denies that she took her shoes off except while sitting at her desk, which is in a nonpublic area within the branch.

Third, Benjamin Peek wore sunglasses in the branch in front of customers on instances in which he arrived to work late.  Peek corroborated that he did this occasionally when he arrived and his hands were full with his travel mug and briefcase.  He testified he would remove his sunglasses once he reached his desk.  The dress code does not address sunglasses.

Fourth, Kuri witnessed Jennifer McMenamin on occasion wearing flip-flop sandals as well as what he characterized as "not a professional shirt."  Kuri conceded that McMenamin would change into regular shoes, although "[n]ot immediately."  However, he could not recall her ever interacting with customers while wearing flip-flops.  As for McMenamin's allegedly

unprofessional shirt, Kuri testified that it had "cut-off sleeves" but was not a T-shirt.

There is no evidence that Rosado, Panati, or Annas were ever aware of the alleged violations of the dress code by Bauer, Peek, or McMenamin.

### III

Defendants first move for summary judgment on Kuri's claims under the ADA. Defendants contend that Kuri has failed to establish a prima facie case for an ADA violation because he has not adduced evidence to establish that his hip condition is a disability recognized under the ADA.

A disability is "a physical or mental impairment that substantially limits one or more . . . major life activities." 42 U.S.C. § 12102(A).[2] The court "must first identify the specific life activities that the plaintiff claims are affected and determine whether those activities are 'major life activities' under the ADA, and then must evaluate whether the plaintiff's impairment substantially limits those major life activities." Larkin v. Methacton Sch. Dist., 773 F. Supp. 2d 508, 523 (E.D. Pa. 2011) (quoting Taylor v. Phoenixville Sch.

─────────────────────

2.   A "disability" may also include "a record of such an impairment" or an individual's "being regarded as having such an impairment." 42 U.S.C. § 12102(B), (C). However, Kuri argues only that he suffers from a physical impairment and does not argue that he is a qualified individual with a disability based on either of these definitions.

Dist., 184 F.3d 296, 308 (3d Cir. 1999)).  Whether an impairment substantially limits a major life activity is discerned on a "case-by-case basis." Id. (quoting Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 566 (1999)). Likewise, whether an impairment qualifies as a disability is assessed "from the point at which the alleged discriminatory decision was made." Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524, 535-36 (3d Cir.), amended on reh'g (Mar. 8, 2007) (citation omitted).

To survive summary judgment, Kuri must produce evidence from which a reasonable juror could conclude that his hip condition substantially impaired a major life function in July 2021, when he was terminated.  Kuri avers that his hip condition substantially impaired his ability to "walk, lift, sit, move and work."  Nonetheless, he offers no medical records or testimony from a treating physician.  Rather, he seeks to rely almost exclusively on his own deposition testimony and his assertions, made in emails he sent to his supervisors and pleadings filed in this matter, in which he asserts that he is disabled.  The court cannot consider Kuri's allegations from his complaint or his conclusory allegations elsewhere that are not otherwise supported by evidence in the record.

Kuri's deposition testimony is likewise unavailing. Much of his testimony on the status of his hip condition relates to various times in 2020, well before his July 2021 termination.

-10-

Kuri testified that he was still receiving treatment for his hip condition at the time of his deposition in April 2022.  However, testimony on the state of his condition in April 2022 is not close enough in time to be probative of the state of his condition back in July 2021.  In addition, although Kuri describes the pain that his hip condition caused, his testimony is almost entirely devoid of how his condition affected any of his life activities.

Kuri's only evidence regarding the impact of his hip condition in 2021 comes from an email exchange from June 2021 in which Kuri requests and returns the necessary paperwork to take FMLA leave.  Included in this exhibit is a "Certification of Health Care Provider for Employee's Serious Health Condition Under the Family and Medical Leave Act," which had been filled out by Kuri's doctor.  In the form, Kuri's doctor states that he would need to receive injections every three months and ablations every six months, along with ongoing pain management treatments.  She further notes that Kuri's hip condition would cause him periods of incapacity lasting one day every six to eight weeks.  This form simply does not shed light on whether or how his hip condition impaired any major life activities.  Significantly, the doctor wrote that Kuri was "capable of performing essential job functions."

Kuri cites several cases for the proposition that hip conditions constitute disabilities.  That may be so in some cases, but not on a blanket basis.  As explained above, whether a specific condition is a disability must be decided on a "case-by-case basis."  E.g., Larkin, 773 F. Supp. 2d at 523. Moreover, in each of the cases that Kuri cites, the plaintiffs produced declarations, medical records, and statements from treating physicians that detailed the extent to which the conditions impacted the plaintiffs during the relevant time period.[3]  Kuri has presented no such evidence here.

Kuri cannot establish that his hip condition substantially impaired a major life function at the time he was terminated.  Thus, the court will grant summary judgment in favor of defendants on Kuri's claims under the ADA.

IV

Defendants next move for summary judgment on Kuri's claims under the FMLA.  Kuri asserts that defendants violated

---

3.   See Berkowitz v. Oppenheimer Precision Prod., Inc., Civ. A. No. 13-4917, 2014 WL 5461515, at *4 (E.D. Pa. Oct. 28, 2014) (contemporaneous statement from treating physician); Rosa v. City of Chicago, Civ. A. No. 12-9648, 2014 WL 1715484, at *5 (N.D. Ill. May 1, 2014) (medical records and testimony from treating physician); Sigl v. Travel Tags, Inc., Civ. A. No. 12-1810, 2013 WL 5223681, at *4 (D. Or. Sept. 16, 2013) (detailed declaration from plaintiff regarding condition's impact).

the FMLA by interfering with his ability to take FMLA leave and
by retaliating against him for taking FMLA leave.

Kuri's FMLA interference claim fails.  There is no
dispute that Kuri was approved for and took FMLA leave on July 1
and 6, 2021.  As Kuri was not denied a benefit under the FMLA,
his claim for interference cannot survive.  <u>Capps v. Mondelez
Glob., LLC</u>, 847 F.3d 144, 156 & n.11 (3d Cir. 2017).

Kuri's claim for FMLA retaliation is assessed under
the burden-shifting framework established in <u>McDonnell Douglas
Corp. v. Green</u>, 411 U.S. 792 (1973):

> a plaintiff must first establish a prima
> facie case of discrimination. If the
> plaintiff succeeds, the defendant must
> articulate a legitimate, nondiscriminatory
> reason for the adverse employment action.
> The burden then shifts back to the plaintiff
> to prove, by a preponderance of the
> evidence, that the articulated reason was a
> mere pretext for discrimination.

<u>Capps</u>, 847 F.3d at 151-52 (quoting <u>Ross v. Gilhuly</u>, 755 F.3d
185, 193 (3d Cir. 2014)).

Defendants contend that Kuri was terminated for
repeatedly violating the professional dress policy and that Kuri
has failed to offer sufficient evidence to show that this
legitimate, nondiscriminatory rationale was mere pretext.

It is Kuri's burden to identify "some evidence, direct
or circumstantial, from which a factfinder could reasonably
either (1) disbelieve the employer's articulated legitimate

-13-

reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Branch v. Temple Univ., 554 F. Supp. 3d 642, 664 (E.D. Pa. 2021); see also Fuentes v. Perskie, 32 F.3d 759, 764-65 (3d Cir. 1994).  The evidence must reflect "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" Burton v. Teleflex Inc., 707 F.3d 417, 427 (3d Cir. 2013) (quoting Fuentes, 32 F.3d at 765).

Kuri's evidence of pretext is a mile wide and not an iota deep.  He asserts that the two weeks that passed between his taking FMLA leave and his termination is suggestive of discrimination.  He contends that Rosado and Panati expressed "disdain" toward his use of FMLA leave.  He further contends that the bank selectively enforced the dress code against him and violated its own disciplinary policy by terminating him rather than taking some lesser disciplinary action.  Even taken together and viewed in the light most favorable to Kuri, the evidence is insufficient to show that defendants' reason for terminating him is "unworthy of credence."  Id.

That Kuri was terminated two weeks after his final FMLA leave is insufficient on its own to demonstrate pretext, "especially where, as here, the employer's proffered legitimate

-14-

reason for termination fits neatly into this timeframe."
Brennan v. City of Philadelphia, 856 F. App'x 385, 387
(3d Cir. 2021) (citing Thomas v. Town of Hammonton, 351 F.3d
108, 114 (3d Cir. 2003)).

Kuri's characterization of Rosado and Panati's
"disdain" toward his use of FMLA leave is unsupported by the
evidence.  It is true that Rosado and Panati tracked and
discussed the amount of leave Kuri was taking.  But no inference
of discrimination can be drawn from this act as keeping a record
of an employee's leave use was simply part of their job
responsibilities.  There is no evidence that Rosado and Panati
singled Kuri out in this regard.  It is true that Rosado once
asked Kuri to reschedule a medical procedure and otherwise
referred to Kuri as an "old man."  However, there is no evidence
that Rosado made either of these comments in close proximity to
Kuri's termination.  None of these comments is anything more
than a "stray remark," temporally remote from Kuri's
termination, that is not sufficient to raise a genuine dispute
of material fact.  E.g., Calero v. Cardone Indus., Inc., Civ. A.
No. 11-3192, 2012 WL 2547356, at *8 (E.D. Pa. June 29, 2012).

Kuri's claim that Panati "harassed" him in connection
with his June 2021 FMLA request is totally unsupported in the
record.  Panati merely informed Kuri of the deadline by which he
would need to return the FMLA paperwork.  Kuri's deposition

-15-

testimony is not evidence that Panati treated any other employee differently in regard to an FMLA leave request.  After Kuri informed Panati that he would have trouble returning the paperwork by the deadline, Panati still accepted his paperwork four days late.  The two corresponded by email and phone regarding his request, but Kuri can point to no statement by Panati that could be considered even remotely hostile or antagonistic.

There is no evidence that defendants selectively enforced the bank's dress policy.  It is true that Kuri is the only individual to be disciplined for violating the dress code. But he cannot show that the policy was selectively applied without showing that defendants knowingly ignored other employees' transgressions.  Here, there is no evidence that any of the bank's management personnel were aware of any of the incidents he cites in which Bauer, Peek, or McMenamin allegedly violated the policy.  It is true that Barbara Jackson wore jeans on days other than Fridays.  However, Rosado, her supervisor, gave her and other bank employees permission to "wear jeans [everyday] during the height of the pandemic."  Thus, the bank's decision not to discipline her does not show that it has applied its dress code unevenly.  Wearing jeans with permission is far different from wearing a T-shirt without permission and raising the T-shirt to expose part of one's flank during business hours.

-16-

Although Kuri informed Rosado in an October 2020 email that his peers also violated the policy by not wearing shoes, he did not identify any specific employees who did so, and Rosado informed him that she would remind staff of their obligations under the dress code policy at an upcoming staff meeting.  Kuri also claims that the dress code was selectively enforced against him because he frequently wore a T-shirt at the beginning of shifts and changed into his Meridian Bank sweatshirt "within 30 minutes" of the branch opening.  The surveillance video and the photos of Kuri were taken <u>after</u> the bank had opened.  The important point is that management personnel reprimanded or disciplined him in each of the four instances in which they were aware that he violated the dress code.

Likewise, defendants cannot be said to have violated the bank's progressive discipline policy since the policy clearly allowed for his termination.  The policy states that although discipline is "typically" meted out with growing severity, "depending on the situation, any [disciplinary action] may be repeated, omitted, or taken out of sequence, including, depending on the situation, immediate job termination."

Finally, although the court's inquiry focuses on the evidence that Kuri has adduced, defendants have established that Kuri's repeated violations of the dress code were, in fact, the reason why he was terminated.  On the date of his termination,

-17-

at least three employees voiced concern about Kuri's wearing a T-shirt.  Clearly, Kuri's attire was disruptive to the bank's functioning.  Moreover, the record reflects that Annas, the bank's CEO, gave the final approval to terminate Kuri.  Annas was unaware of Kuri's use of FMLA leave.  Annas decided to approve of Kuri's termination because of Kuri's repeated violation of the dress code policy.  His testimony is unrebutted.  Kuri has no evidence to show pretext.

V

For the aforementioned reasons, the court will grant the motion of defendants for summary judgment.

-18-